**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 5**

| | |
|---|---|
| In The Matter Of: ) | Docket No. CWA-1321-5-23-001 |
| ) | |
| **Natalie Lutz Cardiello, as Interim Trustee** ) | **Proceeding under Section 311(c)** |
| **of Lockhart Chemical Company** ) | **of the Clean Water Act, 33 U.S.C. § 1321(c)** |
| **FKA Additives International** ) | |
| ) | |
| <u>           **Respondent.**                             </u> ) | |

**Administrative Order**

**I.    Jurisdiction and General Provisions**

1. The United States Environmental Protection Agency (EPA) Region 5, is issuing this Order to Natalie Lutz Cardiello, in her official capacity as Interim Trustee for Lockhart Chemical Company, FKA Additives International (Respondent) under Section 311(c) of the Clean Water Act (CWA), 33 U.S.C. § 1321(c), to ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil or hazardous substances in accordance with the CWA during Respondent's operations at the Lockhart Chemical Company facility located at 4302 James P. Cole Blvd Flint, MI 48505 (Facility) as set forth herein.

2. This Order is issued under the authority vested in the President of the United States by Section 311(c) of the CWA, 33 U.S.C. § 1321(c). EPA Region 5 On-Scene Coordinators are authorized to issue orders under Section 311(c) of the CWA based on a series of delegations and an executive order from the President of the United States.

3. Respondent's Facility has a history of unlawful oily wastewater discharges and failures of its containment systems as explained more fully below.

4. Respondent's containment system was and is in a state of disrepair and poses a substantial threat of oily wastewater discharge from the Facility to the Flint River.

5. On October 10, 2022, Lockhart Chemical Company (Debtor) filed bankruptcy under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Pennsylvania (Bankruptcy Court).

6. Natalie Lutz Cardiello was appointed as Interim Trustee for the Debtor on October 11, 2022.

7. On October 19, 2022, Respondent filed a motion seeking authorization to operate the Debtor's business. Respondent explained that prior to the commencement of the bankruptcy case, the Debtor manufactured a wide range of additives for rust preventives, corrosion

inhibitors, emulsifier packages and other processing additives for metalworking and greases. *See* Dkt. No. 17 at ¶3. Respondent further explained that these products, if not properly handled, can lead to contamination of the Flint River. *See id.* at ¶5. Respondent described proper handling of the products to include the continued observation and removal of wastewater from the Debtor's Facility. *Id.*

8. On October 25, 2022, the Bankruptcy Court granted Respondent's motion, and authorized her to operate the Debtor's business for a period of not to exceed 6 months. *See* Dkt. No. 29.

9. Upon information and belief, Respondent plans to start up the Facility's production system, which will allow her to sell the products and other assets that exist in the above-ground storage units located at the Facility.

10. By starting up the Facility's production system, Respondent will generate wastewater that will run through the compromised containment system and increases the existing substantial threat of discharge to the Flint River.

11. Section 959 (b) requires a Trustee to "manage and operate the property" in her possession "according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner of possessor thereof would be bound to do if in possessions thereof." 28 U.S.C. § 959(b).

12. EPA's exercise of its police and regulatory power falls within the exception to the automatic stay provisions of the Bankruptcy Code. *See* 11 U.S.C. § 362(b)(4).

13. This Order requires Respondent to perform response actions to abate the on-going discharge or substantial threat of discharge of oil and hazardous substances from the Facility.

14. EPA has notified Respondent of this Order by serving a copy of the Order on her in her capacity as such.

15. Terms used in this Order that are defined in the CWA or the National Oil Hazardous Substances Pollution Contingency Plan (NCP) have the meanings assigned to them therein, unless otherwise provided in this Order.

## II. Statutory Authority

16. Section 311(b) of the CWA, 33 U.S.C. § 1321(b), prohibits the discharge of oil or hazardous substances in harmful quantities into or upon, among other things, the navigable waters of the United States, adjoining shorelines, or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States.

17. Pursuant to CWA Section 311(b)(4), 33 U.S.C. § 1321(b)(4), EPA has determined by regulation that discharges of oil in such quantities as may be harmful to the public health or welfare or environment of the United States include discharges of oil that "(a) [v]iolate

applicable water quality standards; or (b) [c]ause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines, or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3.

18. A facility is a substantial harm facility if: (1) the facility transfers oil over water to or from vessels and has a total oil storage capacity greater than or equal to 42,000 gallons; or (2) the facility's total oil storage capacity is greater than or equal to 1,000,000 gallons and one of the following is true: (a) the facility does not have sufficient secondary containment to contain the capacity of the largest above-ground oil storage tank plus freeboard for precipitation with each storage area; (b) the facility is located at a distance (as calculated from the appropriate formula in 40 C.F.R. Part 112, Appendix C) such that a discharge from the facility could cause injury to fish and wildlife and sensitive environments; (c) the facility is located at a distance (as calculated from the appropriate formula in 40 C.F.R. Part 112, Appendix C) such that a discharge from the facility would shut down a public drinking water intake; or (d) the facility has had a reportable oil spill of at least 10,000 gallons within the last five years. *See* 40 C.F.R. § 112.20(f)(1); Substantial harm criteria in Attachment C-I of Appendix C to 40 C.F.R. Part 112.

19. Section 311(c) of the CWA, 33 U.S.C. § 1321(c), provides that the President shall, in accordance with the NCP and any appropriate Area Contingency Plan, ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance, among other things, into or on the navigable waters, on the adjoining shorelines to the navigable waters or that may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States.

20. Section 311(c) of the CWA, 33 U.S.C. § 1321(c), further provides that an operator of a facility participating in removal of a discharge and in mitigation or prevention of a substantial threat of a discharge shall act in accordance with the NCP, the Area Contingency Plan and the applicable response plan required under subsection (j), or as directed by the On-Scene Coordinator except that the owner or operator may deviate from the applicable response plan if the On-Scene Coordinator determines that deviation from the response plan would provide for a more expeditious or effective response to the spill or mitigation of its environmental effects.

### III. Applicability

21. This Order applies to Respondent and any successors, assigns, or other entities or persons otherwise bound by law. Any change in ownership or corporate status of Respondent, including a transfer of assets or real or personal property, does not alter Respondent's responsibilities under this Order.

22. Respondent must ensure that its contractors, subcontractors, and agents comply with this Order. Respondent may be liable for any violations of the Order by its employees, agents, contractors, or subcontractors.

## IV.     Findings of Fact

23.  Respondent is the Interim Trustee for the Debtor and is serving as the legal representative of the Debtor's estate with authorization to operate the Debtor's business.

24.  Respondent operates the Lockhart Chemical Company Facility located at 4302 James P. Cole Boulevard Flint, Michigan 48505.

25.  At all times relevant to this Order, Respondent was and remains the owner and/or operator of aboveground storage tanks, aboveground bulk storage containers, and oil filled operating and manufacturing equipment located at the Facility.

26.  The types of oil stored at the Facility include mineral oils, petroleum, sulfonates, used oils, and waxes.

27.  The Facility's total capacity for storage of oil is approximately 1,063,650 gallons.

28.  The Facility also stores hazardous substances and hazardous waste.

29.  The Facility is located approximately 0.4 mile west of the Flint River and Mott Lake.

30.  The Flint River is a 78.3-mile-long (126.0 km) river that flows through Michigan in the United States. The cities of Lapeer, Flint, Flushing, and Montrose are along its course.

31.  The Facility's utility tunnel has been converted to a secondary containment system for the oil and hazardous substances and waste stored in drums, containers, and aboveground storage tanks at the Facility (the Secondary Containment System).

32.  The Facility has no other secondary containment system for the oil and hazardous substances and waste stored at the Facility.

33.  The Secondary Containment System also collects wastewater and stormwater that contacts process waste.

34.  A stormwater line from the City of Flint's stormwater system transects the Facility near the Secondary Containment System.

35.  Material from the Secondary Containment System permeates into the City of Flint's stormwater system at the Facility.

36.  Oil and hazardous substances in the Secondary Containment System can discharge to the Flint River through this stormwater line.

37. The Secondary Containment System is in a state of disrepair. For example, a sump structure in the Secondary Containment System is breached which can result in the Secondary Containment System becoming overwhelmed and increasing the existing threat of a discharge of oil and hazardous substances from the Secondary Containment System into the Flint River.

38. The Secondary Containment System is also used for collection of stormwater and wastewater, which can also overwhelm the Secondary Containment System and increase the existing threat of a discharge of oil and hazardous substances from the Secondary Containment System into the Flint River.

39. As of the date of this Order, oil and hazardous substances pose a substantial threat of a discharge from the Facility due to the improper maintenance of the of oil water separator, other aboveground storage tanks, bulk storage containers, and oil containing operating and manufacturing equipment, inadequate secondary containment, the use of the Secondary Containment System to collect wastewater and stormwater, and disrepair of the Secondary Containment System.

40. Upon information and belief, Respondent intends to start up the Facility's production system, which will generate wastewater that will run through the Secondary Containment System.

41. Upon information and belief, the Secondary Containment System currently contains residual oil and potentially hazardous substances.

42. Adding wastewater to the Secondary Containment System poses a substantial threat of a discharge of oil and hazardous substances into the Flint River.

43. Operating the Facility without adequate secondary containment violates regulations set forth at 40 CFR Part 112.

44. The amount of oil and hazardous substances at the Facility, the lack of adequate secondary containment, and the location of the Facility pose a substantial threat of a discharge oil and hazardous substances into the Flint River.

45. The amount of oil and hazardous substances stored at the Facility and used for operation of equipment at the Facility is of such a size and character as to be a substantial threat to public health and welfare.

46. On November 18, 2022, EPA and United States Department of Justice (DOJ) representatives spoke with Respondent about the possibility of EPA issuing this Order to address the start up of the Facility's production system and use of the Secondary Containment System.

47. On November 23, 2022, EPA and DOJ provided a draft copy of this Order for Respondent to review.

5

48. This Order was revised after consideration of certain issues raised by Respondent to the draft Order.

49. EPA finds that its monitoring and oversight of Respondent's ownership, operation, and proposed start up of the Facility's production system are necessary to mitigate or prevent a substantial threat of a discharge from the Facility.

Previous Releases

50. On June 15, 2022, an oily sheen appeared along approximately 12 miles of the Flint River downstream of the Facility. Federal, State and local responders (Emergency Responders) traced the oil back to the Facility.

51. Emergency Responders determined the source of the sheen was a discharge from the Facility that began on June 14, 2022, due to the compromised integrity of the Secondary Containment System.

52. On June 15, 2022, the Genesee Health Department issued an Order Finding Imminent Danger related to the discharge.

53. On June 16, 2022, the Genesee Health Department issued a Medical Health Officer Amended Order Finding Concern for Imminent Danger to the Public Health in relation to the discharge.

54. Emergency Responders recovered approximately 14,500 gallons of oil discharged into the Flint River from the Facility.

55. Emergency Responders recovered approximately 42,119 gallons of oily wastewater from the Facility's Secondary Containment System that posed a substantial threat of discharge from the Facility to the Flint River.

56. On a November 15, 2022, visit to the Facility, EPA observed a sheen in the Flint River at the Outfall from the stormwater line that transects the Facility.

57. Upon information and belief, the Facility continues to discharge oil into the Flint River.

**V.    Conclusions of Law and Determinations**

58. Respondent's Facility is an "onshore facility" as defined by Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10) and by Section 1001(24) of OPA, 33 U.S.C. § 2701(24).

59. Respondent is a "person" as defined by Section 311(a)(7) of the CWA, 33 U.S.C. § 1321(a)(7) and by Section 1001(27) of OPA, 33 U.S.C. § 2701(27).

6

60.     Respondent is the "owner" and/or "operator" of the Facility as defined by Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6) and Section 1001(26) of OPA, 33 U.S.C. § 2701(26).

61.     The Facility is a substantial harm facility as defined by 40 C.F.R. § 112.20(f)(1). See also, Substantial harm criteria in Attachment C-I of Appendix C to 40 C.F.R. Part 112.

62.     Respondent is the representative of the Debtor's estate with the capacity to sue and be sued. 11 U.S.C. § 323 and 28 U.S.C. § 959(a).

63.     Respondent must manage and operate property of the estate, in accordance with state law in the same manner that the owner of possessor thereof would be bound to do if in possession thereof. 28 U.S.C. § 959(b).

64.     Courts have interpreted Section 959(b) to apply to compliance obligations under federal laws as well. *See, e.g., Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1666 (2019) (trustee must manage estate "in accordance with applicable law" in a trademark case); *Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d at 864-66 (a Chapter 11 debtor could not avoid enforcement of RCRA, including financial assurance requirements during bankruptcy); *In re Commonwealth Oil Refining Co.*, 805 F.2d 1175 (5th Cir.1986) (same); *see also United States v. Wheeling-Pittsburgh Steel Corp.*, 818 F.2d 1077, 1086 (3d Cir. 1987) (a Chapter 11 debtor was obligated to comply with the Clean Air Act during bankruptcy); *Norris Square Civic Ass'n v. Saint Mary Hosp.*, 86 B.R. 393, 398 (E.D. Pa. 1988) ("28 U.S.C. § 959(b) requires a debtor to conform with applicable federal, state, and local law in conducting its business"); *In re Sewanee Land, Coal & Cattle, Inc.*, 34 B.R.696, 697 (N.D. Ala. 1983) (the bankruptcy court's injunction of the Department of the Interior's closure of an unpermitted mining operation violated Section 959(b)); *In re Trans World Airlines, Inc.*, 275 B.R. 712, 722 (Bankr. D. Del. 2002) ("A debtor which continues to operate post-petition is obligated to do so in accordance with its other legal obligations. To fail to do so may subject the debtor to suit.").

65.     Respondent stands in the shoes of the Debtor and, as representative of the estate, acquired the rights to the Debtor's property subject to all obligations that may have existed at the time the estate was created. *Cook v. Tullis*, 85 U.S. 332, 341 (1873) (trustee is subject to same legal and equitable rights and obligations as bankrupt); *In re Gebco Inv. Corp.*, 641 F.2d 143, 146 (3d Cir. 1981) (trustee "stands in the shoes" of the debtor); In re Magnus Harmonica Corp., 262 F.2d 515, 517 (3d Cir. 1959) (trustee in bankruptcy "takes over the bankrupt's situation as he finds it."); *In re S. Rachles Inc.*, 131 B.R. 782, 785 (Bankr. D.N.J. 1991); *In re Light*, 23 B.R. 482, 484 (Bankr. E.D. Mich. 1982) (Holding that the trustee stands "in the debtor's shoes" and does not obtain rights greater than those held by the debtor at the time the petition was filed.).

66.     The automatic stay provisions of the Bankruptcy Code do not apply when the government is seeking to enforce its police or regulatory power. 11 U.S.C. § 362(b)(4). *Wheeling-Pittsburgh*, 818 F.2d at 1086. *See also, Penn Terra, Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 278-79 (3d Cir. 1984) (Suit brought to compel debtor's estate to comply with administrative orders to prevent future harm and remedy environmental hazards did not violate the automatic stay provision of 11 U.S.C. § 362).

67. Trustees may be sued with respect to any of their acts or transactions in carrying on business in connection with their property without leave of the court. 28 U.S.C. § 959(a).

68. According to laboratory analysis performed by the U.S. Coast Guard-Marine Safety Laboratories, the product in the outfall and in the aboveground storage tanks is "oil" as defined in Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1).

69. "Oil" and/or "hazardous substances" as defined in Sections 311(a)(1) and/or (a)(14) of the CWA, 33 U.S.C. §§ 1321(a)(1) and/or (a)(14), are currently present at and around the Facility.

70. An actual or threatened "discharge" as defined in Section 311(a)(2) of the CWA, 33 U.S.C. § 1321(a)(2), is occurring, has occurred, or will occur at or from the Facility.

71. The Flint River is a "navigable water" of the United States as defined in Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

72. The discharge of oil from the Facility has caused or may cause a film or sheen upon or discoloration of the surface or adjoining shorelines of the Flint River and has caused a sludge or emulsion to be deposited beneath the surface of the Flint River or upon adjoining shorelines which may be harmful as provided in 40 C.F.R. § 110.3(b).

73. There is or has been a discharge or substantial threat of discharge of oil in harmful quantities from the Facility operated by Respondent within the meaning of Section 311(c)(2) of the CWA, 33 U.S.C. § 1321(c)(2).

74. The Flint River is a "natural resource" within the meaning of the NCP, 40 C.F.R. § 300.5.

75. A discharge at or from the Facility may affect "natural resources," as defined by Section 300.5 of the NCP.

76. A "removal" as defined by Section 311(a)(8) of the CWA, 33 U.S.C. § 1321(a)(8), and Section 300.5 of the NCP is necessary to prevent, minimize and/or mitigate damage to public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches, habitat, and other living or nonliving natural resources under the jurisdiction or control of the United States from discharges and releases from the Facility.

77. The measures and requirements set forth in this Order are consistent with the NCP and necessary to protect public health and the environment and to abate, prevent, minimize, stabilize, mitigate or eliminate the discharge or substantial threat of a discharge at or from the Facility to navigable waters, adjoining shorelines or which may affect natural resources of the United States.

## VI. Order

78. Based upon the foregoing findings of fact, conclusions of law and determinations, and the administrative record in this matter, EPA orders Respondent to comply with the CWA and perform removal actions in connection with the discharge of oil at or from the Facility. Respondent must comply with the requirements set forth below.

### Designation of Contractor and Project Coordinator

79. Respondent must seek authorization from the Bankruptcy Court within 5 business days to retain a contractor(s) to investigate the source and extent of contamination from Respondent's operations, and to perform the removal actions to abate the on-going discharge or substantial threat of discharge of oil and hazardous substances from the Facility into the Flint River.

80. Respondent must designate a Project Coordinator who will oversee Respondent's actions required by this Order. Within 2 business days of authorization by the Bankruptcy Court described in paragraph 79 above, Respondent must submit the name, address, telephone number, email address and qualifications of said individual or firm to EPA. To the greatest extent possible, the Contractor and Project Coordinator must be on site or readily available during the site work and Work Plan implementation described below.

### Work to Be Performed

81. Respondent must perform the work necessary to complete the actions described below within the timeframes specified and consistent with the NCP at 40 C.F.R. Part 300.

82. Respondent must perform the following actions as required by the section 311 of the CWA:

   a. Prior to starting up the Facility's production system, implement any engineering controls and contingency measures consistent with the CWA and as set forth in the approved Work Plan to prevent and/or mitigate the discharge of oil and/or hazardous substances from the Facility into the Flint River;

   b. In accordance with the schedule in the approved Work Plan, eliminate the substantial threat of the discharge of oil and hazardous substances from the Facility;

   c. In accordance with the schedule in the approved Work Plan, remove the oil and the hazardous substances from the Facility or repair or replace the Secondary Containment System at the Facility; and

   d. As applicable, maintain boom and other mitigating measures to prevent migration of oil and hazardous substances at and around the outfall that is actively discharging oil from the Facility into the Flint River.

9

Work Plan and Implementation

83. Within the earlier of either 5 business days after designation of a Contractor and Project Coordinator or 10 days after the Effective Date of this Order, Respondent must submit to EPA for approval a draft Work Plan. The draft Work Plan must include an expeditious schedule for performing the following activities.

   a. Implement engineering controls and contingency measures consistent with the CWA to prevent and/or mitigate the discharge of oil and/or hazardous substances from the Facility into the Flint River;

   b. In accordance with the CWA, remove the oil and the hazardous substances from the Facility and/or repair or replace the Secondary Containment System at the Facility.

   c. Maintain and operate oil recovery and containment devices and equipment, such as berms, vacuum trucks, absorbent/containment booms, tanker trucks, fractionation tanks, *etc*., as required by the CWA;

   d. In accordance with the CWA and as determined to be necessary by the On-Scene Coordinator, perform air monitoring and sampling and/or surface water sampling at the Facility and at the nearest sensitive receptors including but not limited to the residential properties and commercial properties adjacent to the area of discharge and the Facility;

   e. Mitigate and abate the discharge of oil and hazardous substances from the Facility to the Flint River in accordance with CWA, 11 U.S.C. § 362(b)(4), and 28 U.S.C. § 959;

   f. Dispose of all wastes generated by Respondent's activities at EPA approved disposal facilities; and

   g. Record and track the volume of recovered oil during the response, including oil, oily water, oily debris and other oily materials (*e.g*., boom, soil, etc.).

84. If EPA requires revisions to the Work Plan, as required by the CWA, Respondent must submit a revised Work Plan within 3 business days of receiving EPA's revisions. The approved Work Plan, the schedule, and any subsequent modifications are incorporated into and fully enforceable under this Order.

85. Respondent must implement the Work Plan as approved by EPA and in accordance with the CWA pursuant to the approved schedule. Respondent must not start or undertake any removal action relating to the discharge, including the starting up of the Facility's production system, without prior EPA approval.

Health and Safety Plan

86. Respondent must develop a plan that protects the health and safety of all persons acting on behalf of Respondent during the performance of work under this Order in accordance with applicable Occupational Safety and Health Administration (OSHA) regulations at 29 C.F.R. Part 1910. If EPA determines it is appropriate under applicable law, the plan must also include contingency planning. Respondent must submit this plan to EPA for review and comment within the earlier of either 5 business days after designation of a Contractor and Project Coordinator or 10 days after the Effective Date of this Order.

87. Respondent must incorporate all changes to the plan recommended by EPA that are consistent with applicable law and implement the plan. The reviewed plan must be in effect before Respondent begins any significant removal actions.

Reporting Requirements

88. Within 30 calendar days after completion of the work required by this Order, Respondent must submit via email a draft Final Report to EPA for approval as required by the CWA. The Final Report must include: a description of all work completed; the quantities and types of materials removed off-site and disposal records; analytical results of all sampling performed; monitoring and analytical data; incurred costs; and all documentation related to the removal actions completed. The Final Report must also include the following certification signed by a person who supervised or directed the preparation of the report:

> Under penalty of law, I certify that to the best of my knowledge, after appropriate inquiries of all relevant persons involved in the preparation of this report, the information submitted is true, accurate and complete.

89. Consistent with the requirements of the CWA, EPA may approve, disapprove, or require revisions to the draft Final Report. If EPA requires revisions, Respondent must submit a revised Final Report within 5 business days of receiving EPA's revisions.

90. Respondent must submit all plans, reports and other documents required by this Order by email to:

> Tricia Edwards, On-Scene Coordinator
> U.S. EPA
> Emergency Response and Removal Branch, Section 2
> 2565 Plymouth Road
> Ann Arbor, MI 48105
> Edwards.Tricia@epa.gov

91. Respondent may assert a business confidentiality claim pursuant to 40 C.F.R. § 2.203(b) with respect to part or all of any information submitted to EPA pursuant to this Order, provided such claim is allowed by Section 308(b)(2) of CWA, 33 U.S.C. § 1318(b)(2). EPA shall only disclose information covered by a business confidentiality claim to the extent permitted by,

and by means of the procedures set forth at 40 C.F.R. Part 2, Subpart B. If no such claim accompanies the information when it is received by EPA, EPA may make it available to the public without further notice to Respondent. Respondent may not assert confidentiality claims with respect to any data or documents related to site conditions, sampling, monitoring or effluent data.

Access to Property and Information

92. Respondent must provide and/or obtain access to the Facility and to all documents related to conditions at the Facility and work conducted under this Order. Respondent must provide this access to EPA, and EPA's contractors and representatives. Respondent must notify EPA immediately of any denial of access to areas that Respondent does not own or control.

93. Respondent must retain all documents and information relating to the work performed under and the implementation of this Order and relating to the oil and/or hazardous substances found on or discharged from the Facility for 5 years after completing removal actions required by this Order. Before destroying any documents or information, Respondent must notify EPA that the documents and/or information are available to EPA for inspection and, upon request, must provide the documents and/or information to EPA. In addition, Respondent must provide these documents and/or this information at any time before the 5-year period expires at the written request of EPA.

Emergency Response and Notification of Discharges

94. If any incident or change in Facility conditions causes or threatens to cause a discharge of oil or hazardous substances from the Facility or an endangerment to the public health, welfare, or the environment, Respondent immediately must take all appropriate actions to prevent, abate or minimize the discharge or endangerment. Respondent also must notify the EPA On-Scene Coordinator immediately or, if the On-Scene Coordinator is unavailable, must notify the Regional Duty Officer, Emergency Response Branch, Region 5 at (312) 353-2318 of the incident or Facility conditions. If Respondent fails to respond to the discharge or endangerment, EPA reserves the right to respond and may seek recovery of costs associated with any hazardous substance response in accordance with and subject to the requirements for seeking such recovery under the Bankruptcy Code. The United States Coast Guard may seek recovery of costs associated with any oil response in accordance with and subject to the requirements for seeking such recovery under the Bankruptcy Code.

95. Respondent must submit a written report to EPA within 7 business days after each discharge stating the events that occurred and the measures taken or to be taken to mitigate the discharge or endangerment caused or threatened by the discharge and to prevent the reoccurrence of a discharge. Respondent must comply with any other applicable notice requirements, including those in Section 311 of the CWA, 33 U.S.C. § 1321; Section 103 of Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9603; and Section 304 of the Emergency Planning and Community Right-To-Know Act, 42 U.S.C. § 11004.

Compliance with Other Laws

96. Respondent must perform all actions required by this Order in accordance with all applicable Federal, state, and local laws and regulations. Where any portion of the work requires a Federal or state permit or approval, Respondent must submit timely applications and take all other actions necessary to obtain and to comply with all such permits or approvals. This Order is not, and shall not be construed to be, a permit issued under any Federal or state law or regulation. Nothing in this Order shall be construed to relieve Respondent of the requirements of the CWA or any other applicable requirements under federal, state, or local law.

## VII. Authority of the EPA On-Scene Coordinator

97. The On-Scene Coordinator will oversee this Order's implementation. The On-Scene Coordinator has the authority under the NCP, 40 C.F.R. § 300.120, and Section 311(c) of the CWA, 33 U.S.C. 1321(c), to:

   a. Remove or arrange for the removal of a discharge, and mitigate or prevent a substantial threat of a discharge at any time;

   b. Direct or monitor all federal, state, and private actions to remove a discharge;

   c. Remove and, if necessary, destroy a vessel discharging or threatening to discharge; and

   d. Determine when the response action is complete.

## VIII. Reservation of Rights and Penalties

98. This Order does not resolve any of EPA's or the United States' claims or causes of action under federal law. EPA and the United States reserve the right to seek legal or equitable relief under the CWA, the Oil Pollution Act (OPA), the NCP, or other applicable law. This reservation of rights specifically includes, but is not limited to, the rights and authorities of EPA and the United States to: seek legal or equitable relief to enforce the terms of this Order or take any other legal or equitable action as deemed appropriate and necessary; require Respondent in the future to perform additional activities pursuant to the CWA, OPA, the NCP, or other applicable law; take further enforcement action pursuant to Section 311 of the CWA, 33 U.S.C. § 1321, for the violations cited in this Order or for any other violations of the CWA committed by Respondent; or bring an action against Respondent under Section 311(f) of the CWA, 33 U.S.C. § 1321(f), and/or Sections 1002 and 1015 of OPA, 33 U.S.C. §§ 2702 and 2715 or any other applicable statute for recovery of any costs incurred by the United States related to this Order and not reimbursed by Respondent in accordance with and subject to the requirements for seeking such recovery under the Bankruptcy Code. Removal costs shall include, but are not limited to, past costs, direct costs, indirect costs, costs of monitoring and/or oversight activities, and accrued interest as provided in Section 311(f) of the CWA 1002 of OPA, or any other applicable statute for which the United States reserves the right to file an application for administrative expense.

99. If a court issues an order that invalidates any provision of this Order or finds that Respondent has sufficient cause not to comply with one or more provisions of this Order, Respondent remains bound to comply with all provisions of this Order not invalidated by such court's order.

100. Violation of any term of this Order may subject Respondent to civil penalties of up to $37,500 per day of violation or an amount up to 3 times the cost incurred by the Oil Spill Liability Trust Fund under Section 311(b)(7)(B) of the CWA, 33 U.S.C. § 1321(b)(7)(B), as adjusted by 40 C.F.R. § 19.4, and such penalties would be subject to the requirements for seeking recovery under the Bankruptcy Code, including filing an application for administrative expense.

## IX. Other Claims

101. By issuance of this Order, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondent. Neither EPA nor the United States shall be deemed a party to any contract entered into by Respondent's directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Order.

102. Nothing in this Order shall constitute or be construed as a release from any claim, cause of action or demand in law or equity against any person, firm, venture, partnership, association, or corporation not bound by this Order for any liability it may have arising out of or relating in any way to the generation, storage, treatment, handling, transportation, discharge, release, or disposal of any oil, solid wastes, hazardous substances or contaminants found at, taken to, or taken from the Facility or for any other liability for costs or expenses related to the removal activities described in this Order.

## X. Notification of Completion

103. Respondent may request that EPA provide a notice of completion of the work required by this Order. If EPA determines that Respondent has completed all work according to this Order, except for certain continuing obligations (e.g., record retention), EPA will notify Respondent in writing. If EPA determines that Respondent has not completed any work according to this Order, EPA will notify Respondent, identify the deficiencies, and require Respondent to modify the Work Plan if appropriate to correct the deficiencies. Respondent must implement the modified and approved Work Plan and must submit a modified Final Report for EPA approval according to the EPA notice.

## XI. Effective Date

104. The effective date of this Order shall be the date of signature by the EPA.

IT IS SO ORDERED.

By: _____  Date: _____
Tricia Edwards
On-Scene Coordinator
Superfund and Emergency Management Division
U.S. Environmental Protection Agency
Region 5